UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

In re:                              :
                                         Case #11-75802
KALAISH GOBINDRAM                   :


                                    :
          For Chapter 7
-------------------------------- :
Plaintiff                            Adversary Case #11-09499
BANK OF INDIA, NEW YORK BRANCH      :
and
BANK OF BARODA, NEW YORK BRANCH     :


              -against-            :
                                     290 Federal Plaza
Defendant                         : Central Islip, NY 11722
KALAISH GOBINDRAM.                  December 3, 2013
-------------------------------- : 12:43:58 a.m.


TRANSCRIPT OF TRIAL BEFORE
JUDGE ROBERT GROSSMAN,
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Plaintiff:              WORMSER KIELY GALEF & JACOBS LLP
                            BY:   JOSEPH E. CZERNIAWSKI, ESQ.
                            825 Third Avenue
                            New York, New York 10022
                            (212) 573-0637


For Defendant/Debtor:       THE LAW OFFICES OF MARK J. FRIEDMAN
                            BY:   MARK J. FRIEDMAN, ESQ.
                            66 Split Rock Road
                            Syosset, New York 11791
                            (516) 653-2480


Transcription Service:        Carole Ludwig,
                              *Transcription Services*
                              141 East Third Street #3E
                              New York, New York 10009
                              Phone:  (212) 420-0771
                              Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| Howard Berzow | 5 | 17 | | |
| Kalaish Gobindram | 23 | 35 | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| none | | | | |

1   (Proceedings commence at 12:43:58)

2          THE CLERK:  Bank of India v. Gobindram.

3          THE COURT:   All right, who can tell me where we

4   are, metaphysically speaking?

5          MR. JOSEPH CZERNIAWSKI:   Okay, good morning, Your

6   Honor, Joseph Czerniawski from Wormser, Kiely, Galef &

7   Jacobs for plaintiffs, Bank of India and Bank of Baroda.

8   With me at the table is Mr. Persaud from Bank of India and

9   Mr. Ramiswamy from Bank of Baroda.

10          Quickly to cover a few housekeeping matters that

11   are in front of you --

12          THE COURT:   Hold on.  Mr. Friedman, can I get

13   your appearance?  Stop, stop. Can we get your appearance,

14   please?

15          MR. MARK FRIEDMAN:   Mark Friedman, Law Offices of

16   Mark J. Friedman, on behalf of debtor, Kalaish Gobindram,

17   defendant in this adversary proceeding.  With me today is my

18   law clerk, Tommy Frank, he's a student at St. John's Law

19   School and is just here to observe for today if that's

20   permissible.

21          THE COURT:   Okay.

22          MR. FRIEDMAN:  Thank you, Your Honor, for --

23          MR. CZERNIAWSKI:  Should we make clear who else in

24   the courtroom, Your Honor?

25          THE COURT:  Excuse me, I can't hear you unless you

PROCEEDING                        4

1  speak at the microphone.

2          MR. CZERNIAWSKI:  Should we make clear who else is

3  in the courtroom at this time, Your Honor?

4          THE COURT:  Not necessarily.

5          MR. CZERNIAWSKI:  So for housekeeping items Your

6  Honor should have in front of you along with the deputy

7  clerk, as well as the witness, the original copies of joint

8  exhibits 1 through 16 which have been admitted. There should

9  be two additional binders that are in front of you as well

10 as the witness. One is a new set of exhibits, joint exhibits

11 17 through 24, which have been agreed to be jointly

12 admissible, as well as a binder of transcripts in this case.

13 The transcripts, the first is the trial transcript from day

14 one of the trial, as well as the depositions of Mr.

15 Gobindram and the depositions of Mr. Berzow personally.

16          So where we last left off after the discussion of

17 the debtors admitting to false statements in the financial

18 affairs and invoking a reliance on counsel defense, we

19 agreed to postpone the case for some discovery.  So given

20 the posture that we're in right now what I intend to do is

21 call Mr. Berzow, who is Mr. Gobindram's former attorney, to

22 the stand, and then after I question him and Mr. Friedman

23 also questions him I'd like to recall the debtor, Mr.

24 Gobindram in to the stand.

25          THE COURT:  Okay.

1    MR. CZERNIAWSKI:  So I'd like to call at this time

2  Mr. Howard Berzow.

3    (witness sworn)

4    THE CLERK:  Please state and spell your name for

5  the record.

6    THE WITNESS:  Howard S. Berzow, B-E-R-Z-O-W.

7  DIRECT EXAMINATION BY

8  MR. CZERNIAWSKI:

9    Q:   Good afternoon, Mr. Berzow.  Is it correct that

10  Mr. Gobindram engaged you and your firm around March of

11  2011?

12    A:   Yes.

13    Q:   If you take a look at the, there's three binders

14  in front of you, if you take a look at the binders that are

15  placed, that is labeled joint exhibits 17 through 24 --

16    A:   There's one that's marked supplemental joint

17  exhibits, is that what you mean.

18    Q:   I'm sorry, supplemental joint exhibits, yes, I'm

19  sorry.  I'd like you to turn your attention to supplement

20  joint exhibit 18.  Sir, do you recognize joint exhibit 18?

21    A:   Yes.

22    Q:   And what is it?

23    A:   It was essentially what you'd call a reaffirmation

24  of debt on Mr. Gobindram.

25    Q:   Is it correct that at or near the time that Mr.

1  Gobindram first engaged you he made clear that he intended

2  to reaffirm the debt on his residence?

3      A:   Yes.

4      Q:   Prior to the filing of the bankruptcy petition in

5  this case, did you have any conversations with Mr. Gobindram

6  about the ramifications if he transferred his tax refund to

7  creditors?

8      A:   Yes.

9      Q:   And what did you tell him in those conversations?

10     A:   Well my best recollection is he had mentioned to

11 me that there was a possibility that he would receive tax

12 refunds from the federal and New York State governments, and

13 I told him that if he had received the tax refunds prior to

14 any bankruptcy, if that was what we were going to do, there

15 was a potential that those payments could be recovered

16 preferentially by a trustee that may be appointed in this

17 case.  And I also told him in response to a question about

18 whether or not he could pay people he owed money to, that as

19 long as there were (indiscernible) obligations there's no

20 prohibition about him using those funds to pay the given

21 debt.

22     Q:   Could you turn to joint exhibit 19 in this case.

23 Sir, do you recognize joint exhibit 19?

24     A:   Yes.

25     Q:   And what is joint exhibit 19?

BERZOW - DIRECT (By Czerniawski)                    7

1      A:   It's a handwritten note that I made on June 20,

2   2011, after meeting with Mr. Gobindram and his wife.

3      Q:   Sir, does, upon review of joint exhibit 19, did --

4   did Mr. Gobindram tell you that he received federal and

5   state tax refunds of $120,000?

6      A:   Yes.

7      Q:   Okay.  And was June 20, 2011, the first time that

8   he told you that he received those refunds?

9      A:   Yes.

10     Q:   Now, sir, do you -- shortly after you learned of

11  this information, did you go with Mr. Gobindram to a June

12  27th meeting with the banks' representatives?

13     A:   With him and his wife.

14     Q:   Okay.

15     A:   We met with the, with the banks and their

16  attorneys at their offices in New York City.

17     Q:   Did you have a conversation with Mr. Gobindram

18  shortly before that meeting in which he asked you not to

19  disclose to the banks that he received the tax refund?

20     A:   Yes.

21     Q:   What exactly did he say?

22     A:   Well I can't give you quote, you know, verbatim

23  what he said, but he, the substance of the conversation was

24  -- well, let me take you back a bit.  We were discussing

25  what we were going to say at the meeting and this meeting

BERZOW - DIRECT (By Czerniawski)          8

1 that we were having with him and his wife was just outside

2 the, your law offices, downstairs on the street, and we had

3 a little parlay and we were discussing what we, what was

4 going to be said. And the idea was that there was going to

5 be, we were going to try and make a settlement, a proposal

6 to settle the bank problem, the banks' problems with him.

7 And he indicated to me that he didn't want me to disclose

8 the fact that he had recently received tax refunds.

9       Q:   Did you, did you agree that you would tell the

10 banks on Mr. Gobindram's behalf that any money that would be

11 offered he would borrow from a relative in Singapore?

12      A:   Not exactly in those words, no.  what he, what I

13 -- I had asked him at this meeting before we went up to meet

14 the bank, the banks and the lawyers, first of all, if we

15 make a proposal, where am I, they're going to ask you where

16 your cash is going to come from to make the proposal.  And

17 that's when he said to me that, well, we'll tell them that

18 we have some relatives in, it could have been Indonesia,

19 somewhere in that part of the world, that they would be able

20 to borrow money from those relatives to make the, to make

21 the offer.

22      Q:   Okay.  Could you now turn your attention to the,

23 the other set of exhibits labeled joint exhibits 1 through

24 16.  And turn to joint exhibit 6.  Sir, are you there, sir?

25      A:   I'm there.

BERZOW - DIRECT (By Czerniawski)          9

1   Q:   Shortly after the June 27th meeting -- at the June

2  -- strike that.   At the June 27th meeting with the banks, did

3  Mr. Gobindram agree to provide a financial statement to the

4  banks?

5      A:   I don't believe so, not at that time.

6      Q:   Okay.   Well do you recognize joint exhibit 6 in

7  front of you?

8      A:   Yes.

9      Q:   And what is joint exhibit 6?

10     A:   It's a financial statement for Mr. and Mrs.

11 Gobindram, she's referred to as Jacqueline Melson, and it

12 speaks as of June 30, 2011.

13     Q:   And did the banks request that Mr. Gobindram

14 provide a financial statement to them at the June 27th

15 meeting?

16     A:   I'm not sure if they requested it or Mr. Gobindram

17 offered it.   It was understood that following that meeting

18 in order for the bank's to evaluate the proposal that he

19 made at the meeting on June 27th, that they would like to

20 look at a financial statement of him and his wife.

21     Q:   Does the statement reflected in joint exhibit 6

22 disclose the federal and New York State tax refund that Mr.

23 Gobindram received?

24     A:   No.

25     Q:   Sir, when did you know that Mr. Gobindram disposed

1   of the proceeds of the tax refund?

2      A:    I didn't have the details of the disposition of

3   the tax refunds until after the bankruptcy petition was

4   filed on August 15th of 2011.

5      Q:    Okay, I think you jumped one question ahead of

6   where I was.

7      A:    Pardon me.

8      Q:    When did you know that Mr. Gobindram disposed of

9   the proceeds of the tax refunds?

10     A:    As opposed to knowing the details.

11     Q:    Correct?

12     A:    Well on June 20th he told me that he had received

13  them, he had received and -- it may be partially that he

14  disposed of some of it, I don't know that he told me he

15  disposed of all of it.

16     Q:    So would it be correct to say that at or shortly

17  after June 20th you knew that he disposed of the tax refund

18  proceeds?

19     A:    Did I know?

20     Q:    Yes.

21     A:    Yes.

22     Q:    And prior to the filing of the petition did you

23  know how Mr. Gobindram spent the tax refund?

24     A:    No.

25     Q:    Prior to the filing of the petition, did Mr.

1  Gobindram give you any copies of checks or other documents

2  that would have shown you how he disposed of or transferred

3  the tax refund?

4       A:   Is the question prior to the filing?

5       Q:   Correct.

6       A:   No.

7       Q:   And if Mr. Gobindram had testified to the contrary

8  in this courtroom would that testimony be accurate?

9       A:   Doesn't match my recollection.

10      Q:   Could you turn your attention in the exhibit

11 booklet to what's been labeled joint exhibit 20?

12      A:   Twenty is in the other one, right?

13      Q:   Twenty is in the supplemental book.

14      A:   Okay, give me a moment.  Okay.

15      Q:   And sir, do you recognize joint exhibit 20?

16      A:   Yeah.

17      Q:   Does joint exhibit 20 reflect the fact that

18 attorneys from Ruskin Moscow sent to Mr. Gobindram a draft

19 bankruptcy petition for his review before filing the

20 petition?

21      A:   Well that's what the email says, yes.

22      Q:   And I'll have you turn to the next exhibit, joint

23 exhibit 21, do you see that?

24      A:   Yes, I do.

25      Q:   And in joint exhibit 21, Mr. Gobindram is replying

1  to the provision of the draft bankruptcy petition, is that

2  correct?

3      A:   He's responding to Michael Rosea (phonetic) who

4  was our associate attorney who worked on this case at that

5  time.

6      Q:   All right.  In the first, in the top email that's

7  in joint exhibit 21, Mr. -- well, first of all, before we go

8  into the actual email, who is Michael Rosea?

9      A:   I just said Michael Rosea was an associates

10 attorney at the Ruskin firm at this period of time and

11 worked in our financial services department and worked with

12 me on the preparation of the bankruptcy petition for Mr.

13 Gobindram.

14     Q:   And on the top email that's at joint exhibit 21,

15 when Mr. Gobindram wrote, "Dear Michael, I have read

16 everything, it looks fine," what do you understand that to

17 mean?

18     A:   Just what it says.

19     Q:   Do you believe there was any reason to change or

20 revise the bankruptcy petition based upon what Mr. Gobindram

21 told you?

22     A:   No.

23     Q:   I'd like you to turn your attention to the next

24 exhibit, joint exhibit 22.  Do you recognize joint exhibit

25 22?

1      A:   Yes.

2      Q:   Now for point of reference, the bankruptcy filing

3  occurred on August 15, 2011.  Sir, does joint exhibit 22

4  reflect the first time that you learned of how Mr. Gobindram

5  spent the tax refund money?

6      A:   Yes.

7      Q:   Sir, from your perspective, did you time the

8  filing of Mr. Gobindram's bankruptcy petition to be after

9  Mr. Gobindram had transferred the tax refund money to other

10 creditors or his wife?

11     A:   No.

12     Q:   And if Mr. Gobindram had testified to the

13 contrary, would that be accurate?

14     A:   I don't believe so.

15     Q:   Sir, did you have a physical in person meeting

16 with Mr. Gobindram shortly before filing of the documents?

17     A:   Are you referring to the bankruptcy petition,

18 itself?

19     Q:   Correct, I'm sorry.

20     A:   Okay. On August 11th, Mr. Gobindram and his wife

21 came to my office for the purposes of reviewing the

22 bankruptcy petition draft that had been prepared at that

23 time.  And we discussed the bankruptcy petition, I signed it

24 on that day and so did he, and then he asked to take it home

25 so that he could review it and then he would bring it back

1  and give me instructions (inaudible).

2       Q:   Did there ever come a point -- well, strike.

3       At that meeting, was there a point where you said to

4  Mr. Gobindram, "there's a whole bunch of documents there,

5  just keep signing"?

6       A:   I have no recollection of making that statement.

7            MR. CZERNIAWSKI:  Your Honor, I'd like to show the

8  witness a question that you asked at the first day of trial

9  and ask him to tell us whether that testimony is accurate

10 from the transcript.

11           THE COURT:  You want to read the question?

12           MR. CZERNIAWSKI:  Sure, I want to read, I can read

13 the transcript from the trial.  So we go to the trial

14 transcript --

15      A:   Do you want me to follow with you?

16      Q:   Go to the trial transcript in the transcript

17 binder.

18      A:   Okay, give me a second.

19      Q:   Sure.

20      A:   Where do I go?

21      Q:   Turn to page 56, line 22.

22      A:   Line 22, where there's a question?

23      Q:   Correct.

24      A:   Okay.

25      Q:   Okay, I'm just going to read to you the series of

1  question and answers from the Court to Mr. Gobindram.

2  "Court," the Court asks, "hold it one second, you don't have

3  to answer this, you can exercise the privilege potentially.

4  Did you tell Mr. Berzow that you had received the tax refund

5  and that you had spent that money by distributing it to

6  creditors or your wife?"  Mr. Gobindram answers "yes, sir, I

7  had."  The Court asks again, "you told him that?"  The

8  witness said "yes."  The Court asked, "before you signed

9  these papers," referring to the bankruptcy petition, the

10 witness answers "that is correct, absolutely correct."  Sir,

11 is that testimony accurate?

12      A:   No, I think he's mistaken.

13      Q:   And why do you believe that?

14      A:   Because before the bankruptcy I didn't know how

15 the tax refunds were divided and disposed of.

16          MR. CZERNIAWSKI:  Your Honor, I have one further

17 question, there is an exhibit that I want to introduce and

18 it's not in the binders, but I have copies made, it will

19 just take one second.

20          THE COURT:  Does counsel have a copy?

21          MR. CZERNIAWSKI:  Yes, I showed, we agreed it's

22 jointly admissible and I showed him before the hearing. For

23 the record, while letting the witness review it, joint

24 exhibit 25, because it's not in the binders, is a two page

25 email which begins with a June 15, 2011, email from Mr.

1  Gobindram to Mr. Berzow and has a Bates stamp of RMF01846

2  through 47.

3      Q:   Sir, have you had a chance to review joint exhibit

4  25?

5      A:   Not completely, give me a moment, please.

6      Q:   Okay.

7      A:   Okay.

8      Q:   Sir, you, the questions that I asked you deal with

9  the middle email that you wrote to Mr. Gobindram on June 15th

10 at 9:11 a.m.  The third sentence of your email is "you need

11 to remember that if you file bankruptcy now you will lose

12 all rights to the tax refund."  Would it be correct, based

13 on prior exhibits we've spoken about, that this was, this

14 email was sent about five days before you actually learned

15 he received the tax refund?

16     A:   Yes.

17     Q:   What did you mean when you wrote that if you file

18 bankruptcy now you will lose all rights to the tax refund?

19     A:   Well, if he had filed at that moment and had not

20 received the tax refunds, the tax refunds, to the extent of

21 his ownership interest in them, would pass to a trustee

22 appointed in this case.

23     Q:   And do you believe that you told Mr., Mr.

24 Gobindram that the trustee would have the right to the tax

25 refund if he filed, if he filed before he received the

1  refund?

2       A:    Yes.

3            MR. CZERNIAWSKI:   All right, subject to Mr.

4  Friedman's cross examination of the witness, I am going to

5  finish my questioning of the witness.

6            THE COURT:   All right.

7  CROSS EXAMINATION BY

8  MR. FRIEDMAN:

9       Q:    Good afternoon, Mr. Berzow.

10      A:    Good afternoon.

11      Q:    At the beginning of your testimony, Mr.

12  Czerniawski didn't ask you anything about your background in

13  terms of your practical experience as a bankruptcy attorney.

14  How many years have you been practicing bankruptcy law?

15      A:    Since 1972.

16      Q:    And how many years have you been practicing in the

17  area of consumer bankruptcy law?

18      A:    I never really divided consumer versus business

19  bankruptcy, but most of my bankruptcies I would say were in

20  the business arena.

21      Q:    In the past I believe you said 30 years, how many

22  Chapter 7 bankruptcy filings did you work on in which you

23  represented a debtor?

24      A:    Throughout my career, you mean?

25      Q:    Yes.

1      A:    I don't know the exact number, a lot.

2      Q:    Would you say you've represented more than fifty

3  consumer debtors as their bankruptcy attorney in the course

4  of your career?

5      A:    I don't want to quibble with you over the word

6  consumer. I, most of the --

7      Q:    Well me define it, individuals?

8      A:    Thank you.  Yeah, sure, fifty or more, easily.

9      Q:    And have you represented, were you -- did you

10  represent clients prior to the 2005 revisions to the

11  Bankruptcy Code?

12     A:    Yes, I did.

13     Q:    And have you represented Chapter 7 individual

14  debtors subsequent to the amendments to the, in 2005 to the

15  Bankruptcy Code?

16     A:    Yes, I have.

17     Q:    Sir, are you aware of the responsibilities that a

18  debtor's attorney has based on the revisions and amendments

19  to the Bankruptcy Code that were enacted in 2005?

20     A:    I'm generally familiar with them.

21     Q:    I'd like you to turn to joint exhibit 19.

22     A:    Give me one second, 19?

23     Q:    Yes.

24     A:    Okay.

25     Q:    Can you read from exhibit 19 the sixth line down

1   that starts with the word need?

2        A:    Need?

3        Q:    Yes.

4        A:    "Need a schedule of disbursements which

5   approximates 80K."

6        Q:    Can you state why you wrote that statement or what

7   prompted you to write that statement?

8        A:    What prompted me to write it is the conversation I

9   had with Mr. Gobindram.

10       Q:    Would it be fair to say in that conversation that

11  you were apprised or made aware of that disbursements were

12  made in the approximate amount of $80,000 from the tax

13  refunds received by the debtor prior to the filing?

14       A:    Can you repeat that question for me.

15       Q:    Would it be fair to say -- actually, I'd prefer

16  not to repeat it.  Would it be possible for the Court to

17  read it back?

18            THE COURT:  Read back the last question, please.

19       Q:    Can you read back the last question?

20            COURT REPORTER:  I'm sorry, I'm going to try.  I'm

21  sorry, I'm having difficulty going back to it.

22            THE COURT:  I can't hear you.

23            COURT REPORTER:  I'm having difficulty going back

24  to it.

25            THE COURT:  It was just the last question.

1       COURT REPORTER:  I know.

2            (OFF THE RECORD)

3       COURT REPORTER:  I may not be able to do it. I'm

4  trying but it's not --

5       THE COURT:  You're not able to do it or the system

6  is not able --

7       COURT REPORTER:  I am not able to do it.

8            (OFF THE RECORD)

9    Q:   I'll rephrase the question, or repeat the

10 question.  Mr. Berzow, why did you write -- what was the

11 basis for you writing the statement "need a schedule of

12 disbursements which approximates 80K"?

13       THE COURT:  Okay, hold it, can we not have to hear

14 this when he's doing it?

15    Q:   I'll ask the question again.

16    A:   I think I got the question.

17    Q:   I'll allow you to answer it, please?

18    A:   I imagine it's Mr. Gobindram has told me in the

19 course of this conversation that he had disbursed $80,000 of

20 the refund.

21    Q:   Did you review the petition, schedules and

22 statement of financial affairs that were prepared by your

23 firm for Mr. Gobindram prior to them being given to Mr.

24 Gobindram for signature?

25    A:   Yes.

1     Q:    Did you review them prior to -- strike that.

2        Are you aware of any changes and corrections that

3   needed to be made to the petition, schedule, schedules or

4   statement of financial affairs after you reviewed them and

5   prior to providing them to Mr. Gobindram for signature?

6     A:    At that time I obviously didn't see that there

7   needed to be some additional information inserted both in

8   the, in the bankruptcy petition schedules and the statement

9   of affairs, just an overlook on my part at that time.  Based

10  on subsequent review and what I have learned since and

11  through the deposition and what have you, it was obviously a

12  mistake on my part.

13    Q:    Sort of one follow-up question, and it may be

14  belaboring the point, but if you were aware that he had

15  received the tax refund prior to the filing of the

16  bankruptcy and had made disbursements from those tax refunds

17  prior to the filing of the bankruptcy, why would you allow

18  him to sign the petition, schedules and statement of

19  financial affairs if that information, and the specific

20  information I'm referring to is the receipt of rights to or

21  disbursements of the tax refunds was not reflected in those

22  documents?

23    A:    It obviously was an oversight on my part.  I

24  should have been more careful in the preparation, but there

25  were a lot of things going on in my life at that time. That

1  was in August of 2011, I was planning a move from New York

2  to Florida which took place in October, October 5th. I was

3  planning to move, change my status with my law firm, my

4  daughter was getting married on September 2nd, and a grandson

5  was born on September 4th. So there were a lot of things that

6  were happening, there's no excuse, but that's why I probably

7  overlooked what was happening in the preparation of the

8  petition.

9          MR. FRIEDMAN:  I have no further questions.

10          MR. CZERNIAWSKI:  Your Honor, at this time I would

11  like to recall Mr. Gobindram to the stand.

12          THE COURT:  All right, is everybody done with Mr.

13  Berzow?

14          MR. CZERNIAWSKI:  I am.

15          THE COURT:  You're going to have a direct?  You're

16  not going to call him on direct?

17          MR. FRIEDMAN: I don't believe so, Your Honor.

18          THE COURT:  So everybody, you're done with him

19  all?

20          MR. CZERNIAWSKI:  I'm finished questioning.

21          THE WITNESS:  I'm excused?

22          THE COURT:  Step down.

23          THE WITNESS:  Thank you.

24          THE COURT:  Mr. Gobindram, you're still under

25  oath.

1  DIRECT EXAMINATION BY

2  MR. CZERNIAWSKI:

3       Q:   Good afternoon, Mr. Gobindram.

4       A:   Good afternoon.

5            MR. CZERNIAWSKI:  Your Honor, before we begin,

6  because this issue came up during the last day of trial, I'd

7  like permission to treat Mr. Gobindram as a hostile witness.

8            THE COURT:  He's the defendant, I would assume he

9  is, yeah.

10           MR. CZERNIAWSKI:  Correct.  Okay, so I'm assuming

11 I have that.

12      Q:   Sir, do you recall your testimony at the first day

13 of trial regarding the statement of financial affairs?

14      A:   Could you point it out specifically.

15      Q:   Sure, take the, you'll have one binder in front of

16 you that says joint exhibits 1 through 16, if you take that

17 binder and turn to joint exhibit 11.

18      A:   Gobindram-9, is that what it is?

19      Q:   This is joint exhibit 11?

20      A:   Yeah, it say JE-11.

21      Q:   Correct.

22      A:   Exhibit B.

23      Q:   And sir, do you recall that you testified that

24 that was your signature at the end of this document,

25 correct?

1    A:    Just give me one sec.  Yes, that's correct.

2    Q:    And as to the section of the statement of

3 financial affairs, 3(A) payment to creditors, in 3(C) you've

4 testified that you didn't read those sections?

5    A:    That is correct.

6    Q:    Sir, I'd like you to turn to the statement

7 immediately above your signature, do you see that, sir?

8    A:    Yeah.

9    Q:    And does that statement not say, "I declare under

10 penalty of perjury that I have read the answers contained in

11 the foregoing statement of financial affairs," is that what

12 it says?

13    A:    That's what it says.

14    Q:    Sir, can you now switch to the supplemental joint

15 exhibits, the other binder of exhibits, sir.

16        THE COURT:  One second, you're saying exhibit 11,

17 you never read it, you just signed it, is that right?

18    A:    No, sir, I basically read every, all the answers

19 that I had submitted to Berzow, Mr. Berzow's firm, I read

20 all my answers for accuracy, and that's why I didn't read

21 the, I mean questions that have nothing entered in them, I

22 just didn't do that.

23        THE COURT:  Which part of exhibit 11 can you

24 testify you did read?

25    A:    Okay, all right, here, it says the nature and

1  location and name of businesses, I supplied all that

2  information. I ran through that, I --

3       THE COURT:  So that's number four, correct -- no

4  --

5     A:   That's number 18, sir.

6       MR. CZERNIAWSKI:  Your Honor, I think he's

7  flipping through the exhibit backwards.

8     A:   Oh, I apologize, let me start from the beginning,

9  I apologize, Your Honor.

10      THE COURT:  I assumed you'd go from page one.

11    A:   I apologize.  Okay, on, on this exhibit I read

12  number one.

13      THE COURT:  Okay.

14    A:   I read number four.

15      THE COURT:  You didn't, so you're saying you never

16  read two or three?

17    A:   I, I just glossed because, you know, I was looking

18  for information because the information I had supplied I

19  wanted to make sure that the information was correct.

20      THE COURT:  If you had read number three, would

21  you have changed it?

22    A:   One second.  Let me read it first.

23      THE COURT:  Okay.

24    A:   If I would have read three I would have certainly

25  asked Mr. Berzow, Mr. Berzow, how does this apply to us,

GOBINDRAM - DIRECT (By Czerniawski)          26

1   okay --

2          THE COURT:  So had you read it, you would have

3   known that at least it didn't describe what you thought

4   happened?

5      A:   That's correct.

6          THE COURT:  Okay, go on.

7      Q:   Sir, can you now turn to supplemental joint

8   exhibits, to joint exhibit 21?

9      A:   Twenty-one you said, sir?

10     Q:   Yes, it's the second book of exhibits that are

11  labeled supplemental joint exhibits.

12     A:   Yes.

13     Q:   Okay.  In joint exhibit 21, at the top of that

14  document, you have an email to Mr. Rosea cc-ing Mr. Berzow?

15     A:   Correct.

16     Q:   And in that email you tell Mr. Rosea, "Dear

17  Michael, I have read everything, it looks fine."  Sir, did I

18  read that correctly?

19     A:   Yes, you did.

20     Q:   And you weren't telling the truth to your

21  attorneys there, were you?

22     A:   That's not the way I understood it.

23     Q:   Did you, in fact, read everything?

24     A:   Well I didn't read where there were no answers or

25  anything, it was just questionnaires. I read, in my mind I

1  was reading the information that I supplied and as long as

2  that was accurate in my mind, I did fine.

3      Q:   Sir, would you agree with Mr. Berzow's testimony

4  about --

5          THE COURT:  Hold on one second, please.

6          MR. CZERNIAWSKI:  Sure.

7          THE COURT:  In your mind, to go back to this

8  exhibit that we were just talking about, which is 11,

9  question number 3, payments to creditors, (D) --

10     A:   Yeah, let me turn back to that, hold on.

11     Q:   That's exhibit 11 in the other book.

12     A:   I'm sorry, what question was that, which one?

13         THE COURT:  Question 3(B) and (C).

14     A:   Okay.

15         THE COURT:  Read (B) and (C) and tell me, you say

16 you never read it, you never read this question when you

17 signed it, is that correct?

18     A:   That's correct, everything that was blank I just

19 didn't bother --

20         THE COURT:  It's not blank, it's checked, but,

21 okay, I'll accept that. Read them now and tell me whether

22 had you read them you still would have found them to be

23 accurate or would you have found them to be accurate?

24     A:   If I would have, you know, been, been more

25 attentive, and if I would have read it then I would have

1  certainly brought to Mr. Berzow the question that I had, I

2  mean Mr. Berzow --

3          THE COURT:  What would the question have been?

4      A:   My question would have been, you know, why are

5  these marked, checked off, okay, because we have, I have

6  transferred money to my --

7          THE COURT:  Sir, you knew when you signed this,

8  whether you read it or not, you knew that you had made

9  transfers to your wife.

10     A:   That's correct, sir.

11         THE COURT:  And so that's not an issue, you did

12  make the transfers, you knew you did --

13     A:   Yeah.

14         THE COURT:  And your argument is that you just

15  didn't read it?

16     A:   That is correct.  That is absolutely correct.

17         THE COURT:  Okay.

18     Q:   Sir, will you accept the testimony and the

19  evidence that we've seen today, that you told Mr. Berzow

20  about the tax refund, that you received the tax refund on

21  June 20th?

22     A:   I'm sorry, can you repeat that question for me.

23     Q:   Will you take a look at joint exhibit 19 which we

24  discussed earlier today?

25     A:   Yeah.

1    Q:    And you heard earlier Mr. Berzow testify about

2  this document to the effect that this was the first time he

3  learned you had received the tax refund of $120,000, is that

4  correct?

5    A:    I'm not certain about that.  This is, this is the

6  meeting, but I do not know if it was discussed over the

7  phone that I had received them.  This is a meeting that we

8  had at the offices.

9    Q:    Okay.  I'd like you to turn to your Citibank

10 account statement which is contained at joint exhibit 7.

11   A:    Sorry, can you repeat that?

12   Q:    I'd like you to turn to joint exhibit 7.

13   A:    Seven, okay.

14   Q:    Which is your Citibank statement.

15   A:    Okay. Yes, I'm looking at it.

16   Q:    And you'll see in that, turn to page 2 of joint

17 exhibit 7 with dates around the time period we're

18 discussing?

19   A:    Correct.

20   Q:    And take a look about six entries from the bottom

21 of the page up?

22   A:    Six entries from the bottom.

23   Q:    Bottom of the page up, and you'll see check number

24 7 -- well first let's just go over some old territory, the

25 deposit of $101,780 on 6/16 is your federal tax refund,

GOBINDRAM - DIRECT (By Czerniawski)          30

1  correct?

2       A:   That is correct.

3            THE COURT:   Could you just clarify whose refund it

4  is?

5       Q:   It's the, correct, it is the refund of, given to

6  you and your wife?

7       A:   That is correct.

8            THE COURT:   Your wife is not a debtor, correct?

9       A:   No, sir, she is, she has limited guaranty, I

10 apologize.

11           THE COURT:   You file a joint return?

12      A:   Yes, that is correct.

13           THE COURT:   You got a tax refund jointly?

14      A:   Yes.

15           THE COURT:   All right.

16      A:   That's correct.

17      Q:   I'd actually like to make one other point in

18 connection with that, and this is account is a joint account

19 for you and your wife?

20      A:   That is correct.  That is correct.

21      Q:   Sir, a few entries down below receiving the refund

22 you see a, a check 7521 for $9,830.53?

23      A:   Yeah, I see it.

24      Q:   That's correct?

25      A:   Yes.

1      Q:    All right, if you flip to the accounting of the

2  tax refund that you prepared, at joint exhibit 10 --

3      A:    Joint exhibit 10?

4      Q:    Right, it's in that book and it's three exhibits

5  behind.

6      A:    Okay, I see it.

7      Q:    If you'll look at the third entry for Citi cards

8  A/C --

9      A:    Yeah.

10     Q:    And it's the same number?

11     A:    Yeah.

12     Q:    $9,830.53, correct?

13     A:    Yeah.

14     Q:    So you began making those transfers to other

15  creditors before you met with Mr. Berzow on June 20th,

16  correct?

17     A:    Probably.

18     Q:    I'd like you now to turn to joint exhibit 24, and

19  let me know when you're there, sir.

20         THE COURT:  Could you jus go back, I'm sorry, to

21  10 again?

22     A:    I'm sorry?

23         THE COURT:  Go back to exhibit 10.

24     A:    Ten, I'm sorry,

25         THE COURT:  Entries number 13, 14 and 15?

1    A:   Yes, sir.

2         THE COURT:  Did you owe those car companies in

3  arrears?

4    A:   No.

5         THE COURT:  Well then why did you make a payment

6  for six months in the future on your car?

7    A:   I was out of employment and my wife is the type of

8  person who is worried, you know, she's like any other, she

9  is very panicky. So she didn't want while I'm looking for a

10 job, looking for things, she didn't want to be worried about

11 bills and stuff.

12        THE COURT:  So you had no income coming in, you're

13 worried about your money and you prepay your cars for seven

14 months?

15   A:   Not only the cars, but, you know, there were like

16 our house mortgage and stuff like that, because, you know,

17 we had gotten the money and she didn't know where tomorrow

18 is. So, you know, I did not have a job.

19        THE COURT:  So these payments were done because of

20 your wife's insecurities?

21   A:   That is correct.

22        THE COURT:  So it was your decision to make these

23 payments?

24   A:   That is correct.

25        THE COURT:  All right.

1    Q:   Sir, I'd like you now to turn to joint exhibit 24.

2    A:   Okay.

3    Q:   Take a look at it.  Sir, joint exhibit 24 contains

4 an email sent to you by your attorneys --

5    A:   Right.

6    Q:   And they're forwarding a letter from the Chapter 7

7 trustee in this case.

8    A:   Okay.

9    Q:   And if you look at the attached letter, you'll see

10 item number one that the attorney requests?

11    A:   Yeah.

12    Q:   Is that the first time you learned the trustee was

13 requesting an accounting of the proceeds of your federal tax

14 refund and the State of California refund?

15    A:   Yes.  Yes.

16    Q:   Okay.  I'd like you now to turn to joint exhibit

17 22.

18    A:   Yeah.

19    Q:   Okay, in response to, did you prepare the

20 attachment in joint exhibit 22 in response to the request

21 from the trustee?

22    A:   That is true.  That is correct.

23    Q:   And if you look at the response that you prepared,

24 and that's starting at the second page?

25    A:   Okay.

1   Q:   That response does not include an accounting for

2   the $3,000 in the California tax refund, does it?

3   A:   I don't know, I have not added all this up, sir.

4   Q:   Okay, well your re at the beginning, your re at

5   the beginning says "accounting 2010 federal tax refund

6   proceeds."

7   A:   I worded it like that, I do not know how much all

8   this adds up to.

9   Q:   Okay.  Is there anywhere here that you disclose to

10  the trustee that you actually received an additional $16,000

11  from New York State in tax refunds?

12  A:   I, you know, I had informed Mr. Berzow --

13  Q:   I'm sorry, sir, that's not my question.  Is there

14  anywhere in this document that it discloses to the trustee

15  that you received an additional $16,000 in New York State

16  tax refunds?

17  A:   Whatever accounting I had that's why I disclosed.

18  You know, I didn't break it down necessarily.

19  Q:   Sir, did you disclose at the creditors meeting

20  that you received an additional $20,000 in state tax refunds

21  from the State of New York and California?

22  A:   Whatever the trustee asked me I answered honestly

23  sir, I cannot recall the questions.

24  Q:   Well I'm asking you whether you specifically

25  disclosed that there was an additional --

1   A:   I can't recall, sir.  I cannot recall.

2        THE COURT:  Let him finish the question.

3   A:   I apologize.

4   Q:   Is there anywhere, do you have any recollection

5 that you disclosed that you received an additional $20,000

6 in New York and California tax refunds for 2011 at the

7 creditors meeting?

8   A:   I know I informed the trustee that I had received

9 tax refunds. I can't recall if I broke down specifically

10 what I got from where and all that.  I recall saying that,

11 he had asked the amount and I said it was like $150,000.

12   Q:   Would it be correct actually that you referred to

13 your refund at the creditors meeting as $100,000 plus?

14   A:   Maybe, I can't, you know, I can't --

15   Q:   And your federal tax refund was $101,000, is that

16 correct?

17   A:   Yeah, I can't remember the figures right now,

18 sorry.

19        MR. CZERNIAWSKI:  I have no further questions

20 reserving the right to ask additional questions based on Mr.

21 Friedman.

22 CROSS EXAMINATION BY

23 MR. FRIEDMAN:

24   Q:   Mr. Gobindram, how many bankruptcy attorneys did

25 you consult with prior to retaining Howard Berzow?

1    A:   I consulted two other attorneys.

2    Q:   Why did you retain Howard Berzow over those two

3 other attorneys?

4    A:   Because I visited Mr. Berzow's office and, you

5 know, it was very impressive, and Mr. Berzow, himself, you

6 know, he, he informed me that he had a lot of experience.

7 And besides, one of the, one of the gentlemen I used to work

8 with, the office had said that and my employment said that

9 they used Mr. Berzow in their business bankruptcy.

10   Q:   Is it fair to say that you relied on Mr. Berzow as

11 your counsel to accurately prepare the documents that were

12 presented to you for signature prior to filing them with the

13 court?

14   A:   That is correct.

15   Q:   Did you have any reason to doubt the competency of

16 your counsel while you were working with him?

17   A:   Not at all.

18        MR. FRIEDMAN:  I have no further questions, Your

19 Honor.

20        THE COURT:  The information that I asked you about

21 that you said had you read it you would have changed it, and

22 you knew it was wrong, why did you need anybody to tell you

23 it was wrong?

24   A:   Your Honor, unfortunately it's been my bad habit,

25 okay, that, you know, when I look at a, at a form, you know,

1  if there are, if there are questions, for example, if there

2  is like text which I don't have to respond to,

3  unfortunately, not even just in this instance, I, maybe it's

4  a flaw, you know, I, I just like to address things that I

5  have to address.  Okay, I don't, this was my fault that I

6  didn't read it completely.

7          THE COURT:  But had you read it, you would have

8  known it was wrong, you didn't need anybody to tell you it

9  was wrong?

10     A:   No, I would have known it's wrong and I would

11  have, being the attorney, okay, that he is, I can't just

12  correct it myself, I would have gone to the attorney and

13  said, you know, this information is wrong, okay, maybe

14  somebody did a mistake here.  I would have done that.

15         THE COURT:  I accept that, but your point is that

16  you didn't need anybody to tell you it was wrong, the only

17  reason it's there is you didn't read it?

18     A:   That, that is true, Your Honor, but I wouldn't

19  have changed it myself, I would have told my attorney that

20  it was wrong and let them correct it.

21         THE COURT:  All right, no other questions, you can

22  step down. Do you have any other witnesses?

23         MR. CZERNIAWSKI:  I don't, Your Honor,

24  (inaudible).

25         THE COURT:  All right, plaintiff's case is closed.

1  Mr. Friedman, are you going to call any witnesses?

2          MR. FRIEDMAN:  No, Your Honor.

3          THE COURT:  Defense case is closed.  I'll give you

4  guys an opportunity to put in post trial briefs, work out

5  your schedule, the sooner you get it to me, the sooner you

6  get it to me, the sooner I can deal with it.  But I'm

7  telling, we apparently are, so I, you've got a 727 action

8  based on A(2) and A(4) in this case.

9          MR. CZERNIAWSKI:  Correct, Judge.

10         THE COURT:  One is you made distributions to

11 people and didn't tell anybody who you made distributions

12 to, and two is you had assets and you hid them, essentially,

13 failed to disclose them.  It doesn't seem to be an issue

14 that you did make distributions to people, that should have

15 been disclosed, and it doesn't seem to be that difficult to

16 see that the documents, the petition schedules are wrong.

17 You admitted yourself they're wrong, you just didn't read

18 them.  It appears that the real, it's the sole issue, I'm

19 not limiting what you can do, but the sole issue that you're

20 fighting, you're dealing with, is whether or not the conduct

21 of a lawyer, and specifically the conduct of Mr. Berzow in

22 this case, absolves the debtor from the responsibility of

23 having to read something. Because the issue isn't that had

24 you read it, you didn't know it was wrong, you knew it was

25 wrong, you just didn't read it. So if your defense to this

1    is in some way, well whether your defense is advice of

2    counsel or whether that defense exists or not we'll deal

3    with, but I mean there don't seem to be a lot of other

4    issues in this case.  Nobody is denying that the schedules

5    are misleading -- are wrong.  There were disclosures that

6    were not put in there.  And there's two different issues.

7    One is whether you should have disclosed it, and two, what

8    you did with it anyway.  There are two separate items,

9    there's the disclosure question and the question about what

10   you did with the money and failing to explain what you did

11   with it.

12          So first is the 120, give or take, that's not

13   listed.  Your argument is you told somebody, they didn't put

14   it in the petition and you signed it.  The second issue is

15   the statements that you made, in the petition and the

16   schedules, that there were no distributions made to anyone,

17   any people, that appear as people you would have to list in

18   question 3(B) and (C).  You've got to give me some

19   explanation from a legal standpoint, not an editorial, as to

20   why that is a defense to what is clearly a deficient

21   pleading, schedule.  Plaintiff is free to put in what he

22   wants but I'm not sure what you want to put in. I guess you

23   can respond to this whole question about whether the debtor

24   can rely on, whether the debtor, a debtor in this case or in

25   any case who acknowledges that he knows what's right, but

1  doesn't read the petition and the schedules and relies that

2  counsel who fills it out did it right, that's essentially

3  where this is.

4         So that's what I want to know from you guys, why

5  that doesn't work and why that does work. I don't need a

6  whole history here on the history of 727 and misstatements.

7         MR. CZERNIAWSKI:  For the most part I'm agreeing

8  with Your Honor's analysis.

9         THE COURT:  Thanks.

10        MR. CZERNIAWSKI:  I think to a certain extent --

11        THE COURT:  Can you go up there so I can hear you.

12        MR. CZERNIAWSKI:  I think to a certain extent

13 under 727 A(4)(a) the case is over because the case law says

14 that you cannot say I didn't read it, because the oath that

15 I went through with Mr. Gobindram says two things. It

16 doesn't just say that --

17        THE COURT:  Look, I don't want to reargue this. If

18 you could sign the order than the case would be over, but

19 you don't, I make the decisions.

20        MR. CZERNIAWSKI:  I'm just --

21        THE COURT:  So, listen, make, put in your papers

22 whatever you want to put in. It's not a summary judgment, we

23 have a trial now, we have an evidentiary record, put in what

24 you think the answer is, if you want you put in what you

25 think the defense is.  It's not complicated. Either the

1  defense, I mean he's got the cards he's got, either the

2  defense that you can rely on counsel, and experienced

3  counsel to hand you a document, not read it, but the risk

4  that it's wrong is not yours, it was that you can rely on

5  counsel. Your argument is it doesn't matter what counsel

6  did, you signed it, it was wrong, you lose. I get, I do get

7  the two sideboards here.

8          MR. CZERNIAWSKI:  Okay.

9          THE COURT:  So get them in as quickly as you can

10 and we'll get you an answer, this is not going to be a,

11 should not be a long, drawn out issue.

12         MR. CZERNIAWSKI:  Your Honor has most of the

13 record in front of you, but the one thing I think we'll need

14 is this transcript of the trial today.

15         THE COURT:  Well I'm not going to start working on

16 this before you can get this transcript, I can tell you

17 that. So you've got, don't try to kill yourself by the end

18 of the year to get in papers, because I'm not going to get

19 to this for a little while.

20         MR. CZERNIAWSKI:  Okay.

21         THE COURT:  All right?

22         MR. FRIEDMAN:  One last question, Your Honor, all

23 of the exhibits that have been put forth --

24         THE COURT:  I understand you both jointly agree

25 they're all admitted.

1        MR. FRIEDMAN:  We can refer to them even though

2   they may not have been used during the trial --

3        THE COURT:  They're all part of the record. Every

4   exhibit, as any of you who have read a recent decision of

5   mine, every decision, and I want to be clear about this, we

6   look at the entire record.  People have to get used to this

7   again.  When you introduce exhibits and you don't read them,

8   and those exhibits become adverse to a lawyer's position

9   even though he put it in, they're part of the record and we

10  rely on the entire record. So whatever is in here is in this

11  record, whatever is not, is not in the record.  Everybody,

12  these are all jointly, there is no objection to the

13  admission of any of these exhibits, as I understand, the

14  record is now closed, testimony is closed.

15       So what I'd like you to do is file a joint stip

16  with me telling me, with the Court, telling me the dates by

17  which you'll get us the post trial memorandum.  So work that

18  out with counsel, how you'll do that, just let us know so we

19  can schedule how we're going to handle it.

20       MR. CZERNIAWSKI:  Typically these memorandums for

21  Your Honor come in a memo, an opposition for (inaudible) one

22  another, or two separate memos on the same day?

23       THE COURT:  People can, I've had them where people

24  both file them at the same time, there's others where you

25  agree you'll file yours and he'll reply or he'll file his

1  and he'll reply. What I'd like is, just for my own sanity,

2  whatever you agree on, don't fight about. It's just the

3  issues that you disagree on.  Yours is clear, I think the

4  issue here is very clear and it's a question of law. So I

5  don't put limits on pages, but, you know, have some mercy,

6  there's been enough paper in this case.

7          Okay, thank you all, I appreciate the work, and

8  have a nice holiday if I don't see you.  Court is adjourned.

9  (off the record at 2:29:20)

10          (Whereupon the matter is adjourned.)

11  I, Carole Ludwig, court approved transcriber, certify that

12  the foregoing is a correct transcript from the official

13  electronic sound recording of the proceedings in the above-

14  entitled matter.

15

16  _____          _____

17  CAROLE LUDWIG                          December 11, 2013

18

19

20

21

22

23

24

25